# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 15, 2014 Session

## STATE OF TENNESSEE v. CHRISTOPHER LEE BLUNKALL

**Direct Appeal from the Circuit Court for Marshall County**
**No. 2013-CR-35    Lee Russell, Judge**

---

**No. M2014-00084-CCA-R3-CD - Filed February 5, 2015**

---

A Marshall County Circuit Court Jury convicted the appellant, Christopher Lee Blunkall, of rape of a child, and the trial court sentenced him to thirty-two years in the Tennessee Department of Correction.  On appeal, the appellant challenges the sufficiency of the evidence, the admission of testimony regarding the reaction of the victim's family while the victim was missing, and the length of the sentence imposed. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Robert S. Peters, Winchester, Tennessee, for the appellant, Christopher Lee Blunkall.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Robert Carter, District Attorney General; and Michael D. Randles and Weakley E. Barnard, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

At trial, P.R.[1] testified that she lived in Estill Springs with her four minor children: the victim, B.J., who was fourteen years old and was born on May 5, 1999; S.J., who was ten years old; E.J., who was four years old; and A.R., who was five months old.

---

[1]It is the policy of this court to address the minor victims of sexual crimes and their immediate family members by their initials.

P.R. said that on Monday, April 30, 2012, the victim was twelve years old, was in seventh grade, and was in special education classes. The victim could not tell time, do math, or understand anything but simple words. Additionally, the victim had difficulty understanding complex questions.

P.R. said that on April 30, she woke her children, got ready for work, and got the victim and S.J. ready for school. Around 6:30 a.m, she drove the victim to the house of her maternal grandmother, E.W., in Winchester so the victim could catch the bus for school. The victim was supposed to ride the bus back to E.W.'s house after school. That afternoon, P.R. received a call from E.W., who said that the victim had gotten into a car with someone E.W. did not recognize and was missing.

P.R. contacted the victim's father, who said that he had not seen the victim. P.R. went to E.W.'s house and called the police. The police came to E.W.'s house, spoke with the witnesses, then issued a missing child report.

P.R. said that the victim usually carried a deactivated cellular telephone. P.R. called Verizon and had the telephone activated in an attempt to locate the victim. Throughout the night, P.R. and other family members repeatedly called the victim's telephone and sent text messages but to no avail.

P.R. said that the next morning, May 1, 2012, E.W. called and told her that the victim had been found on the side of the road by a neighbor and taken to Southern Tennessee Hospital. When P.R. arrived at the hospital, the victim had a scratch on one eye and a painful knot on top of her head. The victim said that she had been raped. She "told more than one story about how things happened . . . [, and] some of those stories weren't true." The victim told her mother that she was afraid to reveal the identity of the rapist; however, "[e]very story [the victim] said always came back to [the appellant]. It would give different ways of how she left and where she stayed, but everything came back to [the appellant]." The victim also said that she and the appellant went to the Walking Horse Motel. P.R. did not know the appellant prior to this incident.

P.R. said that the following day, she took the victim to the Children's Advocacy Center in Nashville for an examination. P.R. later learned that the victim and the appellant had talked on the telephone and sent each other text messages for approximately one year. The appellant was listed in the contact list on the victim's cellular telephone as "Baby Boy."

On cross-examination, P.R. said that the victim spent a lot of time with E.W. P.R. got the victim a prepaid cellular telephone for emergencies, believing the victim would be responsible with it. The victim did not use the telephone responsibly; therefore, about two

months prior to April 30, P.R. had the telephone service changed so that the victim could not make or receive calls or send text messages. Nevertheless, the victim contacted the appellant by using other people's telephones without P.R.'s knowledge. When P.R. examined the contact list on the victim's telephone, she found the names of several boys and girls who the victim said were friends from school. P.R. denied that the victim was "boy crazy." P.R. did not know whether the victim sent text messages to boys.

E.W. testified that she lived in a small neighborhood on Cotton Street. A church, a graveyard, and a liquor store were all within walking distance of her house. On April 30, 2012, the victim rode the bus to E.W.'s house after school, arriving at approximately 4:10 p.m. Afterward, the victim used E.W.'s cellular telephone, purportedly to call her father.

After the call, the victim went outside with her cousin Austin to play. Around 5:00 p.m., Austin returned to E.W.'s house, but the victim did not. At that time, E.W.'s niece, Rosa Burks, called and said that the victim had been at the church nearby, that she had gotten into a green car, and that she had left. Burks asked if the victim had permission to leave, and E.W. replied that she did not. E.W. got into her van and tried to locate the green car, but she could not. E.W. then called P.R. to report that the victim was missing. Thereafter, they reported the victim's disappearance to the police. The victim's family drove around all night looking for her. When E.W. checked her cellular telephone, she learned that the text messages the victim had sent immediately prior to her disappearance had been deleted.

E.W. said that at approximately 8:00 a.m. on May 1, 2012, she was driving down Cotton Street and met her neighbor, Linda Joyce Johnson. Johnson stopped her vehicle, and E.W. saw that the victim was with Johnson. The victim told E.W. that she had been raped, and E.W. took her to the emergency room (ER) at Southern Medical Center. E.W. notified P.R. and the police that the victim had been found.

On cross-examination, E.W. said that the victim spent a lot of time with her. She did not know the victim was using her telephone to contact boys, but she later learned the victim had contacted the appellant with her telephone on the day of her disappearance.

The victim testified that her date of birth was May 5, 1999, and that she lived with her mother, stepfather, and siblings. On April 30, 2012, the victim was twelve years old and in the seventh grade. Approximately one year earlier, she got the appellant's telephone number from the contact list on her older cousin Misty's telephone. She began "sneaking" and exchanging text messages with the appellant. She told him her name, age, and the name of her school. The appellant said that his name was "Chris Moore," that he was in his 20s, and that he was employed. The appellant sent the victim photographs of his face and his penis. The victim sent the appellant photographs of her face. He asked her to send photographs of

her vagina, but she refused.

The victim said that she and the appellant decided to meet each other. The victim told the appellant that she loved him, and he responded in kind. She said they referred to each other by the nickname "Baby." The appellant also offered to buy the victim a necklace. They first saw each other at a movie theater in Winchester. They did not speak because Misty was there. Later, they made plans for the appellant to come to Winchester and "take [the victim] away from there." The victim thought that she and the appellant would "be together from that point on" and that they "would start a life together."

The victim said that on the morning of April 30, she went to E.W.'s house then rode the bus to school. While she was at school, she used a cellular telephone she had stolen from her cousin Austin to exchange text messages with the appellant about his coming to school to get her. However, when the appellant sent a message saying he was at the school, the victim could not leave because teachers were outside watching. At the end of the school day, the victim rode the bus to E.W.'s house. She used E.W.'s telephone to send text messages to the appellant, and they ultimately arranged for him to meet her at the nearby church. The victim erased the text messages before returning the telephone to E.W. Afterward, the victim told E.W. that she was going for a walk. She took with her a bag containing some clothes and her deactivated cellular telephone.

The victim said that after she met the appellant at the church, he went to a "drive-thru" of a bank to obtain money. Later, they went to a Burger King restaurant before ending up at a motel, the "Horse Lodge," in Lewisburg. The appellant paid cash for the room, which was located upstairs. In the room, they sat on the couch, talked, and watched television. Afterward, the victim sat on the bed and removed her shirt and pants but kept on her bra and panties. The appellant completely undressed. The appellant did not put on a condom, but he put "some gooey stuff" from a bottle on his penis. The victim said that the appellant penetrated her vagina with his penis and that it "hurt." Afterward, they cleaned up and got dressed. The appellant sat on the couch most of the night, drinking and smoking. The victim slept in the bed.

The victim said that when she woke around 5:00 a.m., she looked at her cellular telephone and noticed she had received numerous text messages and had missed a lot of calls. One of the messages, which was from her mother, indicated that the police were looking for the victim. Soon thereafter, the victim and the appellant left the motel room. The appellant drove to a shed in "some woods" where the appellant said he lived. The victim pulled out her cellular telephone to send her mother a text message. The appellant got angry, took the telephone from her, and threw it out the car window. The appellant said he wanted her to walk with him, and they got out of the car. The appellant pushed her and hit her on the head.

-4-

The victim said that following the altercation, they got back into the car. The victim went with him because he said that he was sorry and was going to take her home. The appellant left her at a church behind a Food Lion in Winchester and drove away. The victim started walking back to her house and was picked up by her neighbor, Johnson. The victim said that she got into the car, started "telling her . . . lies," and revealed that she had been raped. They met E.W., and the victim got into E.W.'s van. E.W. called P.R. and the police to inform them that the victim had been found, then she took the victim to the hospital.

The victim said that when she spoke with employees of the Department of Children's Services (DCS), police detectives, and her mother, she told them that she had been kidnapped by a group of men in a car, that they had taken her to the woods, and that they had raped her. She said that she lied because she was afraid she would get in trouble.

On cross-examination, the victim acknowledged that she had not only sent text messages to the appellant but also to other boys. The victim said that she deleted the appellant's photographs and text messages expressing his desire to have sex with her. She was "pretty sure" that she had deleted most of the text messages they sent each other.

The victim acknowledged that she had given eight conflicting stories about what happened following her disappearance. She first told a detective that several people took her to a wooded area and raped her. She then said that a man named Chris White was with her in a motel in Manchester. Next, she said that "White became angry, grabbed [her] phone, threw it across the yard and tied her up, hands and feet, with rope, placed tape over [her] mouth in the driveway of the house." She later said that White did not tie her with rope but that he did put tape over her mouth. Her fifth version was that White had tape and threatened to put it over her mouth but did not follow through. Other versions were that White did not rape her and that she and White "stayed on the top floor in room 316 at a motel in Manchester." She also told Johnson that she had been grabbed, taken to the woods, had her mouth taped, and was raped. The victim conceded that she had told lies in the past but asserted that she was telling the truth at trial.

Hemant Desai, the owner of the Walking Horse Hotel in Lewisburg, testified that a man filled out a registration card on April 30, 2012. The man identified himself as "Chris Blunkall" and gave his address as 177B Cedar Grove Road, Shelbyville. The appellant indicated on the card that only one guest would stay in the room. He paid cash for the room and was assigned a room on the second floor. The appellant checked out of the room the next day.

Linda Joyce Johnson testified that she and E.W. were neighbors. On April 30, 2012, Johnson learned that the victim was missing. Around 8:00 a.m. the next morning, Johnson

was driving on 4th Avenue Southwest. She was approximately one-half a mile away from Food Lion when she noticed the victim walking ahead of her. Johnson stopped her car and asked the victim where she had been. The victim looked around and said, "I've been raped." The victim got into Johnson's car and began crying. Johnson asked the victim who raped her. The victim said that she did not know him but that he was a white man. She said that the man took her into the woods, took her cellular telephone, put tape over her mouth, and hit her on the head. Johnson noticed scratches on the victim's face. As Johnson and the victim drove away, E.W. drove around the corner. Johnson "flagged her down" and told her about the victim's claims.

Winchester Police Detective Kelly Gass testified that around 5:00 p.m. on April 30, 2012, the police department received a call reporting that the victim was seen leaving with someone in a green or blue vehicle. As a result of the call, Detective Gass went to 419 Cotton Street and also put out a be on the lookout (BOLO) for the vehicle and the victim.

Detective Gass said that around 9:00 a.m. the next morning, he was informed that Johnson had found the victim near the victim's home around 8:00 a.m. Detective Gass went to Southern Tennessee Medical Center to speak with the victim. Detective Gass learned that the victim was twelve years old and that "there had been sexual intercourse involved." The victim gave various stories about what had occurred while she was missing. The victim said that her assailant was "Chris White, Chris George, everything – Chris always stayed consistent. She couldn't remember his last name." Detective Gass knew the victim was not telling the complete truth, so he continued to interview her. He also collected the victim's clothing, which consisted of her pajama pants, t-shirt, panties, and bra. He later sent the clothing to the Tennessee Bureau of Investigation's (TBI) crime laboratory for testing.

Detective Gass said that on May 2, 2012, the victim was taken to the Our Kids Child Advocacy Center in Nashville for a forensic rape examination. Later that night, Detective Gass and Detective Ronnie Durham got into a car with the victim, and she showed them the route that she and the appellant had taken the night she left. She pointed out the Regions Bank automatic teller machine (ATM) where the appellant had gotten money. Thereafter, Detective Gass obtained the security video from the ATM. After speaking with bank personnel and viewing the security video, Detective Gass learned that the man who used the ATM was the appellant. The video also revealed that the appellant's passenger was wearing blue jeans that were ripped at the knee; however, the passenger's face was not visible. Additionally, the appellant's bank statements revealed that he withdrew $140 from the ATM on April 30, 2012.

The victim told Detective Gass the telephone number of the man with whom she exchanged text messages. During the course of Detective Gass's investigation, he learned

that the number corresponded to a TracFone the appellant was using to talk to girls or women. Detective Gass said that a TracFone was a "throwaway" prepaid telephone that could be purchased at any number of stores without disclosing any personal information. The appellant had another cellular telephone, which was associated with the appellant's Verizon Wireless account. Detective Gass researched the telephone records for the TracFone and found a woman who had met the person who owned the telephone; she said that his name was "Chris" but that she did not know his last name. The appellant's prepaid cellular telephone showed that a number of calls had been made to and from the telephones of the victim's grandmother and her cousin Austin.

Detective Gass said that on April 30, the appellant and the victim exchanged numerous text messages. In the messages, they called each other "Baby" and expressed their love for one another. The appellant said that he wanted the victim to be with him, and she encouraged him to come get her. Initially, the victim planned to sneak out of school. When that plan failed, they arranged for the appellant to go to the church near E.W.'s house. Each time that the victim appeared to want to abandon the plan to meet, the appellant cajoled or made her feel guilty until she capitulated.

Detective Gass said that he had P.R. show the victim a photograph of the appellant, and the victim identified him as the perpetrator. During the investigation, the victim said that the appellant's car was green and that on the inside it had camouflage seat covers, a global positioning system (GPS) mounted on the dash, and a manual gearshift in the floor. On May 24, 2012, Detective Gass and another detective stopped the appellant's car. He was driving a two-door Mitsubishi Eclipse, which matched the description given by the victim and the car shown on the ATM's security video. The police searched the car and examined the GPS, discovering that the travel history had been erased from the device. Detective Gass also discovered the appellant's two cellular telephones inside the car. Detective Gass learned that telephone number listed on the receipt from the Walking Horse Hotel matched the appellant's telephone. In a pocket behind the passenger seat, Detective Gass discovered a bottle of KY Warming Liquid.

Detective Gass said that the appellant was taken into custody and transported to the Shelbyville Police Department. Detective Gass told the appellant that the police had read the text messages exchanged by the victim and the appellant. After being advised of his Miranda rights, the appellant was interviewed, and he gave the following written statement:

> [The victim] and I have been texting back and forth for about a year. She wanted to come stay with me, so I went to pick her up after school. I never thought it would happen, but this day, she got in my car and told me to drive. I said, where?

And she said, away from here. I felt awkward sitting there, so I drove away. I didn't have anywhere to go, so instead of driving around, I drove to the bank and got money out and went to a motel. When we got to the motel it was a – a good place to sit back and think about what had just happened. I did something and didn't know what to do to undo it. She saw that I was just sitting there and so we started talking. I was talking to her when she said to shut up and kiss me, as she was crawling in my lap. So I did for about 15 minutes. I was starving, so I decided to go to Burger King and eat. I offered multiple times to get her something to eat and drink, but she said no. Got back to the motel and ate, then laid on the bed beside her and watched t.v. until she woke me up. We laid there until we both fell asleep. And the next thing I know, it's early morning. I had to make a decision to just bite the bullet and take her back home. I went to get some more gas and took her back home and dropped her off close to where I picked her up. She got out and I left to go home.

On cross-examination, Detective Gass acknowledged that the victim told "a whole bunch of stories." He said that P.R. provided him with a list of the names and telephone numbers of people the victim knew. Detective Gass contacted all of the individuals. He was also present while Ashley Sowder, a DCS employee, interviewed the victim. He stepped out of the room when the victim described "the sexual contact in the hotel room."

Detective Gass said that the appellant denied having any sexual activity with the victim. The appellant never recounted the night's events in a chronological order but instead relayed "bits and parts then he would jump over things." Detective Gass said that many of the details the appellant conveyed matched those given by the victim. The primary difference was whether they had intercourse.

On redirect examination, Detective Gass said that the appellant and the victim exchanged text messages for approximately one year. From the messages, Detective Gass deduced that the appellant was "grooming" the victim. He explained that "grooming" was "where a person – usually older person, . . . actually take[s] children and they talk to them over a period of time, they build their trust up." During the interview, the appellant admitted touching the victim's clothing over her buttocks and vaginal area. The appellant said that he believed the victim was fourteen years old.

Chad Johnson, a special agent forensic scientist with the serology/DNA unit of the

TBI crime laboratory, testified that he conducted tests on the sexual assault kit that was performed on the victim and on the clothing the victim was wearing at the time of the incident. All of the items tested were negative for semen.

Lori Littrell testified that she was a certified registered nurse and physician's assistant with the Our Kids Center in Nashville. Littrell said that she performed a forensic sexual abuse examination on the victim at Nashville General Hospital on May 2, 2012, two days after the incident. When Littrell examined the right side of the victim's head, she found a raised area that was tender to the touch. The victim had bruises on the base of both thumbs and on her right forearm. She also had one scratch on her right cheek. When asked about the injuries, the victim stated that the appellant hit her with a baseball bat to prevent her from using her cellular telephone to call her mother. The victim told Littrell that "Chris" had placed his penis inside her vagina and that she had experienced bleeding and pain as a result of the penetration. Littrell described the victim's affect as "somewhat blunted" and said that she had difficulty "elicit[ing] emotion from [the victim] during the exam."

Littrell said that she found no injuries to the victim's external genitalia. During the internal genital examination, Littrell found discharge "in the hymen and in the vaginal vault." She also found an acute tear and redness on the hymen. She opined that the tear had occurred within three days of the examination. The injury was "consistent with blunt force penetrating trauma," which included "[t]he first time of sexual intercourse." Littrell performed a rape kit on the victim.

The thirty-three-year-old appellant testified that at the time of the incident, he had two prepaid cellular telephones. The victim initiated contact with him about one year prior to the incident. He surmised that the victim found his telephone number on someone else's telephone; however, he denied that he knew anyone named Misty. Although he did not know the victim, he began exchanging text messages with her "out of boredom." He also spoke with her a few times by telephone. He admitted sending the victim one photograph of his face but denied sending her a photograph of his genitals or requesting that she send a photograph of her genitals. The appellant told the victim his first name and may have mentioned his last name. He did not tell the victim that he was married.

The appellant said that he was not interested in having sex with the victim. He maintained contact with her because he pitied her. He explained that the victim told him stories about her troubled home life and difficult relationships with her parents and grandmother. He said that he wanted to help the victim. The appellant acknowledged that he and the victim referred to each other as "baby" and that they expressed their love for one another. Nevertheless, he maintained that he did not intend to have "a relationship" with the victim "other than texting." He denied seeing the victim at a movie theater.

The appellant said that "it was obvious that [the victim] was having problems at home" and that she wanted to live with him. On April 30, 2012, he and the victim exchanged text messages. The appellant said that neither of them indicated that they wanted to meet. The appellant stated that he "had no idea" what he was going to do after the victim got into his car. He asserted, "I didn't preplan it by no means, no."

The appellant said that he did not know what the victim looked like because she had sent photographs of several individuals. He denied being sexually attracted to the victim.

The appellant said that after the victim got into his car, he realized that he was in trouble. He drove to an ATM, withdrew money, then drove to the Walking Horse Hotel. He asserted that he could not go home or to a friend's house and that he "had no where else to go." He did not take the victim home immediately because he was afraid of getting in trouble with the police. He decided to take her home the next morning.

The appellant said that after they checked into the room, he kissed the victim twice. Thereafter, they went to Burger King and got food; however, the victim did not want anything to eat. They returned to the room, and the appellant ate his dinner. At some point, they turned on the television. They did not discuss having sex or engage in intercourse. The appellant said that he may have unintentionally touched the victim's "private parts" over her clothing. He stated that the victim never undressed. He removed his shirt and pants while the victim went to the bathroom. He left his underwear on and crawled under the covers of the bed to sleep. When he fell asleep, the victim was on the couch. When he woke the next morning, the victim was on the bed asleep, fully dressed. They were separated by a sheet or a blanket.

The appellant said that he told the victim he was going to take her home. She got mad and said that she could not return home. He denied stopping in the woods, hitting the victim, or throwing away her cellular telephone. The victim told him to leave her at a church close to her house, and he complied.

The appellant said that he had bought the KY lubricant in North Carolina for his personal use several months prior to the incident and that it had been in his car since that time. He denied using the lubricant with anyone else.

On cross-examination, the appellant acknowledged that he may not have told the victim his last name or that he may have given her a "phony" last name. He further acknowledged that he knew he was "dealing with an underage girl." The appellant denied that he called the victim "Baby" or told her he loved her in order to pursue a romantic relationship.

-10-

The appellant said that he went to the victim's school solely to meet the victim. The State asked the appellant why he sent the text, "I want you to come with me, but if you're not ready, don't get my hopes up and tell me you are and you don't. Okay? That's all I ask. If you're for real, then I will call out." The appellant explained that he was supposed to call in to work at a certain time and "[t]hat's why I was trying to push the issue for her to – you know, all I wanted to do was actually meet this dadgum girl." He said that it was "just an expression" when he said "don't get my hopes up" and "[i]f you are for real."

The appellant said that he did not tell the victim he was married because he did not intend to meet her and did not believe it was "necessary" to reveal his marital status. He said that he "didn't actually want [the victim] to come out" of the school and get in his car but that "[i]f she did leave school, . . . I was going to be there for her." He acknowledged that they had previously discussed having him pretend to be her stepfather in order to check her out of school.

The appellant denied that he had been to Winchester prior to April 30, 2012. He said the victim had given him E.W.'s address. He explained that he knew there were graveyards and a liquor store near E.W.'s house because he programmed her address in his GPS. The appellant acknowledged that he erased the history from the GPS.

The appellant denied that he knew the victim intended to go home with him. He acknowledged, however, that several hours before he picked her up, the victim sent text messages saying that she intended to leave with him and that she was going to pack a bag to bring with her. He said that the victim had stated on several previous occasions that she wanted to move in with him; however, neither of them took it seriously. He stated that after he "dropped off" the victim, he stopped at a bridge to relieve himself. When he got out of the vehicle, he noticed the victim had left her bag in his car. He threw the bag into the river. He explained, "I just wanted to erase the night, you know, that happened and I really wanted to just move on and act like it just never even happened." He also explained that he did not want to be caught with the bag in his car.

The appellant acknowledged that the victim told him that she had been raped and that she previously had intercourse with "a lot" of people. However, they never discussed the two of them having sex.

The appellant acknowledged that he left Winchester after the victim got into his car because he did not want to be seen by anyone who knew him. He then drove to Shelbyville, because he was familiar with the area. He said that he withdrew money from an ATM but denied planning to check into a motel. He acknowledged that when he checked into the motel in Lewisburg, he marked on the registration form that only one person would be

staying in the room. The appellant conceded that he had told the officers that the victim was wearing blue jeans with holes in the knees and that he might have put his hands in those holes while kissing her. He explained that the victim was wearing jeans when he picked her up and that she changed into pajama pants in the motel bathroom. He denied touching any of the victim's intimate parts over her clothes but said that if he did, the touching was unintentional.

In rebuttal, the State played a small portion of the appellant's videotaped interview, in which he acknowledged touching the victim's intimate parts over her clothing.

The jury convicted the appellant of rape of a child, and the trial court imposed a sentence of thirty-two years. On appeal, the appellant challenges the sufficiency of the evidence, the admission of the victim's grandmother's testimony regarding the reaction of the victim's family while the victim was missing, and the length of the sentence imposed.

## II. Analysis

A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Rape of a child is defined as the "unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

The evidence, viewed in the light most favorable to the State, revealed that the victim, who had limited mental abilities, exchanged text messages with the appellant for approximately one year. On April 30, 2012, they arranged to meet at a church near her grandmother's house after school. The victim walked from her grandmother's house to the church, got into the appellant's car, and left with him. The appellant drove to an ATM, withdrew money, and took the victim to a motel in Lewisburg. When registering for the room, the appellant indicated that he would be the only person in the room. While they were in the room, the appellant applied lubricant to his penis and had intercourse with the victim. The next morning, the appellant and the victim left the motel. The victim attempted to call her mother, and the appellant threw her telephone away and hit her on the head. Thereafter, he drove the victim to a Food Lion near her home, and she got out of the car. The victim began walking home and was found by a neighbor. The victim gave several versions of events but consistently maintained that she had been raped by "Chris." A forensic sexual assault examination was performed on the victim, which revealed a tender knot on the victim's head and an injury to her hymen that was consistent with "[t]he first time of sexual intercourse."

The appellant contends that the victim's testimony was not credible, citing her numerous versions of the incident and inconsistencies with her trial testimony. It is well-established that determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000).

The appellant further complains that the State presented no evidence to corroborate the victim's testimony, noting that no semen was found on the victim and that none of the text messages indicated the appellant intended to have sex with the victim. Our supreme court has held that the testimony of a minor victim, without more, is sufficient to sustain a conviction for rape of a child. See State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003). Accordingly, no corroboration was necessary. Nevertheless, we note that the appellant's

testimony corroborated much of the victim's testimony. Additionally, the victim's testimony was corroborated by the text messages and by the lubricant found in the appellant's car. Finally, the examination of the victim confirmed penetrating trauma to her hymen, which was consistent with intercourse within seventy-two hours. We conclude that there was ample evidence to sustain the appellant's conviction.

## B. Testimony of Family

The appellant contends that the trial court erred by allowing E.W. to testify regarding her reaction upon learning that the victim was missing. He argues that "how the mother and grandmother and other relatives and friends of [the victim] felt about her disappearance or how they suffered from worry and anguish during her absence is not of consequence in the determination of whether or not [the victim] had been the victim of a child rape." In response, the State contends that the appellant failed to establish that the trial court abused its discretion in allowing the testimony, noting that the incident cited by the appellant "made no mention of the emotions experienced by friends or relatives of the victim as the result of her disappearance" and instead referenced the actions the victim's family undertook to find the victim. We agree with the State.

On direct examination, E.W. testified that Burks called her and said that she had seen the victim get into a green car at the church near E.W.'s home and leave. E.W. then called P.R. and said, "I didn't know whether [the victim] got kidnapped or what. And I told her that somebody got [the victim]." The State then asked, "Somebody got [the victim], you didn't know if she had been kidnapped or not?"

Defense counsel objected, saying, "I can't see how this is relevant in this case as to the reaction of folks to the absence of [the victim] when we all know what actually happened." The trial court overruled the objection. The State resumed its questioning, asking what P.R. did after receiving news of the victim's disappearance. E.W. recalled that P.R. said she was coming to E.W.'s house, that the family called the police, and that they searched for the victim throughout the night.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided . . . . Evidence which is not relevant is not admissible." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. It is within the trial court's discretion to determine whether the proffered evidence is relevant; thus, we will not overturn the trial court's decision absent an abuse of discretion. State v. Forbes, 918 S.W.2d 431, 449 (Tenn. Crim. App. 1995).

As we noted earlier, the appellant complains that the trial court erred by admitting testimony the evidence regarding how the victim's family felt after the victim's disappearance. However, as the State observes, the challenged testimony did not concern the family's emotions upon learning she was missing; instead, it concerned the course of action they took after learning that the victim had gotten into a car with a stranger. We conclude that the trial court did not err by allowing the testimony.

## C. Sentencing

As his final issue, the appellant challenges the length of the sentence imposed by the trial court, contending that the trial court erred by enhancing his sentence beyond minimum sentence of twenty-five years. In response, the State contends that the trial court did not abuse its discretion in sentencing the appellant.

The appellant's presentence report was the sole proof submitted at the sentencing hearing. The parties acknowledged that Tennessee Code Annotated section 39-13-522(b)(2)(A) mandates that a person convicted of rape of a child shall be, at a minimum, sentenced as a Range II offender. Rape of a child is a Class A felony; therefore, the appellant was subject to a sentence of no less than twenty-five years but no more than forty years.

In determining the appropriate sentence within the range, the trial court stated:

> The severity of the sentence should be assessed in relation to the crime. So, let's look back at our jury trial and see what happened. Essentially, he was electronically stalking her for years. She was 11 years old when this process began. So, for about a year, before he succeeded, goes to a school to pick her up, goes through an elaborate procedure to be able to get her to try to protect himself from being discovered as what he was.
>
> This fiction that it was for her benefit because of her terrible family situation is . . . totally negated by the facts this family was not the abusive, neglectful crowd that we see rearing some children. We see them all the time. But that wasn't this situation. Up all night when she was missing.

-15-

Carries her off. Is in several counties. Lands in Lewisburg. Has her all night. Finally gets what he's been after for a year. And then what happened was the really chilling part of the story. This is the, after the rape, then they're on their way somewhere and they stop off at the woods.

And we've all heard the expression, . . . it made the hair on [the] back of my neck stand up. I tell you it is absolutely true that when that part of the trial came, when that came out, that stop by the woods, literally, the hair on the back of my neck stood up because I am convinced that he intended to kill her there and he was going to put her in the woods.

Now, the . . . little girl put up a fight is what happened. Got hit in the head but she put up a fight, otherwise, she'd be dead and he never would have been caught. And I, I fully believe that. But that does not fit comfortably into any of the technical enhancement factors.

But her treatment after, as well as before, his stalking for a year, and what she and the family went through, I just do not believe it's appropriate to start at the minimum of twenty-five years in this case. Unfettered, I would probably make it the maximum, I would make it the 40 years, but I don't believe I can do that.

So, I am going, where I start is at 32 years . . . at a hundred percent. There, technically, are no enhancement factors that I can apply. And believe me, . . . I studied them a long time . . . and couldn't find anything that applied. And goodness knows there are no mitigating factors in this situation. So, 32 years.

Appellate review of the length, range, or manner of service of a sentence imposed by the trial court are to be reviewed under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In conducting its review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and

mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and
>
> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

On appeal, the appellant notes that the trial court found no statutory enhancement or mitigating factors. Nevertheless, he argues that the trial court erred by enhancing his sentence based upon the circumstances of the offenses, particularly the incident that transpired between the appellant and the victim in the woods after leaving the motel. The appellant contends that the victim's version of events was not credible and should not have been used by the trial court to increase the sentence. However, this court has previously

observed that "[a] determination of witness credibility is entrusted to the trial court as the fact finder, which may be considered during sentencing." State v. Ryan James Howard, No. E2011-01571-CCA-R3-CD, 2013 Tenn. Crim. App. LEXIS 25, at *46 (Knoxville, Jan. 10, 2013). In the instant case, the trial court clearly stated its reasons for imposing the thirty-two year sentence, which was within the appropriate statutory range. We conclude that the trial court did not abuse its discretion in sentencing the appellant.

### III. Conclusion

In sum, we conclude that the evidence was sufficient to sustain the appellant's conviction, that the trial court did not err in admitting the testimony of the victim's grandmother, and that the trial court did not abuse its discretion when sentencing the appellant. Thus, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE